**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 21-cr-696 (TJK)** |
| **v.** | : | |
| | : | |
| **MICHAEL AARON CARICO,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Michael Aaron Carico ("Carico") to thirty days in jail, three years of probation, 60 hours of community service, and $500 restitution.

**I.      Introduction**

On January 6, 2021, Carico participated in the storming of the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than one million dollars of property damage.

Carico pled guilty to one count of 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building. As explained herein, a sentence of thirty days in jail, three years of probation, 60 hours of community service, and $500 restitution is appropriate in this case because Carico: (1) entered the Capitol through the Senate Wing Doors about nine minutes after they were breached; (2) spent about 52 minutes in the Capitol and called for a "second wave" of

rioters; (3) left the Capitol only after police officers started clearing the Rotunda; (4) walked around the Capitol building, climbed the media tower near the Inauguration platform, and filmed violence against police officers taking place on the Lower West Terrace; (5) referred to the police officers being attacked as "fucking traitors" and yelled that the Speaker of the House of Representatives should "go fuck [her]self"; (6) subsequently deleted many of the photos and videos he took on January 6; (7) repeatedly denied having done anything wrong, claimed that the day "was peaceful" despite witnessing violence, and said "I'm a Patriot and screw anyone that thinks different"; and (8) expressed remorse only in anticipation of this sentencing, but still made inaccurate statements to the Probation Officer about his marijuana use.

The Court must also consider that Carico's conduct on January 6, like the conduct of hundreds of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. Here, the defendant's participation in a riot that actually succeeded in halting the Congressional certification combined with the defendant's celebration and endorsement of the violence on that day and his minimal remorse renders a jail sentence both necessary and appropriate.

## II.     Factual and Procedural Background

### The January 6, 2021 Attack on the Capitol

To avoid exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* Statement of Offense, ECF No. 21 at 1–7. As this Court knows, a riot cannot occur without rioters, and each rioter's actions—from the most mundane to the most violent— contributed, directly and indirectly, to the violence and destruction of that day. With that backdrop, we turn to the defendant's conduct and behavior on January 6.

*Carico's Role in the January 6, 2021 Attack on the Capitol*

Carico traveled from Florida to Washington, D.C., on January 5, 2021, to attend the "Stop the Steal" rally that was to take place on the National Mall the following day. Carico met two friends in Washington.[1] Together, the three of them toured several monuments on the morning of January 6. Eventually, they arrived at the Ellipse, where they saw the former President speak at the rally. Afterwards, Carico and his friends walked down the National Mall to the West Lawn of the U.S. Capitol.

Carico entered the U.S. Capitol through the Senate Wing Doors at approximately 2:20 p.m., about nine minutes after the nearby window was breached. One of Carico's friends joined him in going in; the other stayed back. Below is a screenshot from U.S. Capitol surveillance video showing Carico entering the Capitol as another rioter climbs through a nearby broken window:



---

[1] As of the time of this filing, neither friend has been charged in connection with the events of January 6, 2021.

Once inside, Carico walked through the Capitol, including the Crypt and the Rotunda. Below is a screenshot from U.S. Capitol surveillance video showing Carico in the Crypt at approximately 2:22 p.m.:



Below is a screenshot from U.S. Capitol surveillance video showing Carico in the Rotunda at approximately 2:45 p.m.:



In this video, Carico appears to be waving for other rioters to follow him down a hallway in the direction of the Old Senate Chamber, where, at the time, there were numerous fights occurring between rioters and law enforcement officers.

During its investigation, the FBI obtained a video showing Carico and other rioters in the Rotunda on January 6, 2021. Although the exact source of this video is unknown, in one portion, the person recording it refers to themselves as a member of the press. In another portion of the video, alarms are audible and Carico yells, "Second wave! Second wave!" *See* Exhibit B. Screenshots from this video, showing Carico amidst the crowd of rioters in the Rotunda, appear below:





Carico left the Rotunda only after police officers started clearing the Rotunda. He departed the Capitol through the Rotunda Doors at approximately 3:12 p.m. In total, Carico was inside the Capitol for approximately 52 minutes.

Upon leaving the Capitol, Carico lingered near the East Stairs and East Plaza. A confidential human source ("CHS") reported to the FBI that Carico told people nearby that he had just been inside the Capitol and, using the screen on his camera, showed them footage he had taken. The CHS provided the FBI with a video showing this interaction. *See* Exhibit C. In this video, Carico boasted to other rioters outside the Capitol that he had "trained with some Tier 1 NSA guys."[2] *See id.* The CHS said that when asked by another rioter, Carico shared his Facebook account name.

Eventually, Carico left the East Plaza and walked to the restricted area on the West Lawn of the Capitol, where the partially constructed Inauguration stage was located. At approximately

---

[2] This investigation has not uncovered any evidence that Carico ever trained with, or was otherwise affiliated with, the National Security Agency ("NSA") or with any branch of the military.

4:27 p.m., Carico filmed a video of himself and one of his friends climbing a ladder to reach the top platform of the media tower. *See* Exhibit D. At the time, the crowd on the West Lawn was chanting "USA" repeatedly. Upon reaching the top of the media tower, Carico zoomed in on the Lower West Terrace, where rioters were fighting with police officers at the entrance to the Inauguration Tunnel. One rioter in the video threw a long wooden object toward the officers defending the Capitol. Carico commented, "There it is—fucking traitors." *See id.* A screenshot from Exhibit D, showing the assault on the Lower West Terrace, appears below:



While on top of the media tower, at approximately 4:30 p.m., Carico filmed a video in which he joined the crowd of rioters in singing the closing lines of the Star-Spangled Banner: "the land of the free, and the home of the brave." *See* Exhibit E. Immediately after he finished singing the National Anthem, Carico turned the camera onto his face and shouted, "Hey Nancy, go fuck yourself!" *See id.* A screenshot from Exhibit E appears below:



Moments later, Carico took the below selfie-style photo from the top of the media tower:



At 4:38 p.m., Carico sent a text message to his father, boasting, "I was inside baby." Seconds later, Carico sent another message, "It is wild."

The next day, January 7, 2021, Carico sent a text message to his mother, writing, in part, "The country is over if People think that was a violent protest." Later that day, Carico sent another text message to his mother: "All [I] know is that I'm a Patriot and screw anyone that thinks different."

In later text messages sent to his parents, Carico denied violating the law on January 6. Carico sent a text message to his father on January 12, 2021, stating, "[I] didn't do anything." On January 20, 2021, Carico texted his mother, in part, "[I] did nothing wrong. So stop stressing please."

On January 19, 2021, Carico corresponded via text message with a person who asked to "interview" Carico about the attack on the Capitol for a "school assignment." Carico offered to be an "anonymous source." He described the events of January 6 in text messages as follows:

- "It was peaceful"

- "[I] saw [] a peaceful rally, cops started flash banging the crowd. Then allowed them past the barrier and into the capital, hence why there wasn't much damage to the entrance. Just a broken window. The cops allowed people through with no resistance. All for the media to run with."

- "When peaceful people get tear gassed over and over, at some point they are going to get mad."

- "The cops lead them to slaughter"

- "Consider this, Mike [P]ence, president of the senate, has secret service. There's no way in hell that it was breached, they allowed it to happen. Plain and simple, all to weaponize it [against] the president."

- "The protesters were unarmed....."

- "They aren't breaking into anything being unarmed lol if they were armed then maybe i would believe it. But they weren[']t."

*Carico's August 16, 2021 Interview*

Carico was interviewed by the FBI immediately following his arrest on August 16, 2021. Carico explained that he went to Washington, D.C., to protest and to "document" the events of the day. Carico identified to the FBI the two friends he had met there. Carico said that he was "doing photography work" and "journalism" on what he called the "infamous January 6." Carico said he

ultimately did not sell any of the photographs or videos. He claimed that, at the time he entered the Capitol, he did not believe that he was doing anything wrong.

*Carico's September 8, 2021 Interview*

Carico agreed to a voluntary interview with the FBI on September 8, 2021, with his attorney present. Carico said that about three days before January 6, he decided to travel to Washington, D.C., to attend then-President Trump's speech. Although he had never participated in a political protest before, and did not consider himself openly political, Carico thought he could take photographs that he could sell to media outlets. Carico said he agreed to meet two friends from California, and he identified them by name to the FBI. Carico drove from Florida to Washington and stayed in a hotel room with his two friends on the night of January 5.

On January 6, 2021, the three of them went to the Lincoln Memorial before attending the "Stop the Steal" rally and President Trump's speech. Afterwards, they followed the crowd to the Capitol. Carico and one of his friends decided to enter the Capitol; the other friend stayed behind because he had brought his dog. Carico denied seeing any signs or hearing any police officers prohibiting him from going inside the Capitol. Carico admitted that he entered the Capitol, including the Rotunda. He estimated that he was inside for 30 to 40 minutes. Carico said he left when officers in the Rotunda told them to leave. Although Carico said he saw people arguing with others who were trying to destroy property, Carico denied witnessing any violence inside.

Carico said that, after leaving the Capitol, he found his other friend outside. Carico then climbed the ladder of the media tower to take photos. There, Carico took photos of rioters on the Lower West Terrace, including rioters he could see struggling against police officers as they attempted to enter the Capitol.

Upon returning to his hotel, Carico said that he watched the news and realized that the events at the Capitol were more serious than he had observed. Carico was nervous about having gone inside. Carico said he deleted the photos on his camera from inside and around the Capitol because he was anxious and did not think they were of high-enough quality to be sold. Carico returned home to Florida on January 7. Carico denied being part of any organized group or having traveled to Washington, D.C., for the purpose of storming the Capitol or causing chaos.

*The Charges and Plea Agreement*

On July 22, 2021, Carico was charged in a four-count Complaint with violating 18 U.S.C. § 1752(a)(1) and (2) and 40 U.S.C. § 5104(e)(2)(D) and (G). The FBI arrested Carico at his home in Burbank, California, on August 11, 2021. On November 29, 2021, Carico was charged in a four-count Information with violating 18 U.S.C. § 1752(a)(1) and (2) and 40 U.S.C. § 5104(e)(2)(D) and (G).

On December 21, 2021, Carico pleaded guilty to Count Four of the Information, charging him with violating 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in the Capitol Building. By plea agreement, Carico agreed to pay $500 in restitution to the Architect of the Capitol.

## III.    Statutory Penalties

Carico now faces sentencing on a single count of 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, Carico faces up to six months of imprisonment and a fine of up to $5,000. Carico must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078–79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

IV.    **Sentencing Factors Under 18 U.S.C. § 3553(a)**

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of incarceration.

**A.  The Nature and Circumstances of the Offense**

The attack on the U.S. Capitol, on January 6, 2021 is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

Though each defendant should be sentenced based on their individual conduct, this Court should note that each person who entered the Capitol on January 6 without authorization did so under the most extreme of circumstances. As they entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades and heard the throes of a mob. Depending on the timing and location of their approach, they also may have observed extensive fighting with law enforcement officials and smelled chemical irritants in the air. No rioter was a mere tourist that day.

Additionally, a defendant's individual conduct should be assessed on a spectrum. This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical

factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from law enforcement officials; and (9) whether the defendant demonstrated sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.

To be clear, had Carico personally engaged in violence or destruction, he would be facing additional charges and/or penalties associated with that conduct. The absence of violent or destructive acts on Carico's part is therefore not a mitigating factor in a misdemeanor case, nor does it meaningfully distinguish Carico from most other misdemeanor defendants.

Carico entered the Capitol early, just minutes after the Senate Wing Doors were first breached by his fellow rioters. He went inside even though one of his friends made the wise choice not to follow the crowd. While in the Rotunda, Carico celebrated and encouraged further rioting when he called for a "second wave." And Carico didn't leave the Capitol because he realized he shouldn't be there or because he'd had enough. Instead, after nearly an hour inside, he was forced out of the Rotunda as officers began to retake that area. Even then, Carico stayed nearby so that he could brag to those around him about his exploits. Carico showed footage that he had taken inside the Capitol to other rioters, shared his Facebook name, and falsely boasted that he was affiliated with the NSA. In short, Carico was clearly proud of having overtaken the Capitol and of having spent nearly an hour inside.

But that wasn't enough rioting for Carico. Rather than leave the Capitol Grounds after being ushered out of the Capitol, Carico went back to the West Lawn, where he climbed the media tower to get a better view of the mayhem. From his perch, he witnessed violence against police officers on the Lower West Terrace, including one rioter who threw a wooden object at police officers as they struggled against rioters near the Inauguration Tunnel.[3] Carico narrated, "There it is—fucking traitors." In the context of his other statements, including that the protestors were peaceful and that police allowed protestors into the Capitol "for the media to run with" and to "weaponize it [against] the president," the "fucking traitors" Carico was apparently referring to were the police officers who were guarding the Capitol. Carico then shouted that the Speaker of the House of Representatives (whose workplace he had just invaded) should "go fuck [her]self."

Carico carried a camera with him and apparently filmed many of his exploits. He told the FBI that he had intended to sell footage from January 6 but deleted it after realizing the full extent of the Capitol riot. The evidence that Carico destroyed limits the government's and the Court's insight into what Carico did or said on January 6. From what remains, though, it is obvious that Carico enjoyed his role in the riot and that he was not present merely to document the events of the day. Instead, he called for a "second wave" of rioters, characterized police officers as "fucking traitors," and told the Speaker of the House to "fuck [her]self." Immediately after watching the

---

[3] "The fighting in the Lower West Terrace tunnel was nothing short of brutal. Here, I observed approximately 30 police officers standing shoulder to shoulder, maybe four or five abreast, using the weight of their bodies to hold back the onslaught of violent attackers. Many of these officers were injured, bleeding, and fatigued, but they continued to hold the line." *Testimony of USCP Sgt. Gonell, MPD Officer Fanone, USCP Officer Dunn, and MPD Officer Hodges*: Hearing Before the House Select Comm. to Investigate the January 6th Attack on the United States Capitol, 117 Cong. (July 27, 2021) (Statement of Officer Michael Fanone) available at https://www.c-span.org/video/?513434-1/capitol-dc-police-testify-january-6-attack.

struggle on the Lower West Terrace, Carico celebrated by singing the National Anthem and taking a selfie.

At no point did Carico do anything to stop the violence and destruction he witnessed. To the contrary, despite watching and filming rioters fighting and throwing objects at police officers, Carico continued to falsely claim for weeks that January 6 "was peaceful" and that "cops allowed people through . . . for the media to run with." Since breaching the Capitol, Carico has demonstrated extremely limited remorse. In text messages sent in the days following January 6, Carico insisted that he had done "nothing wrong" and that he was "a Patriot and screw anyone that thinks different." At the time of his arrest, Carico sarcastically referred to it as the "infamous January 6" and claimed that he had been acting as a "journalist." It was not until his pre-sentence interview that Carico claimed that he was "quite remorseful and upset at how things have transpired" and that his criminal conduct on January 6 contributed to "erasing all of his hard work" over the years. In short, Carico appears to be sorry for the consequences he faces—not his actions.

Accordingly, the nature and the circumstances of Carico's offense establish the need for a sentence of incarceration.

### B. The History and Characteristics of the Defendant

Carico is 33 years old and experienced what he referred to as a "typical childhood" growing up in Tampa, Florida. Both of his parents were educators. Following his high school graduation, he earned an Associate's Degree in Business Management and Marketing. From 2015 until his arrest, Carico lived in Southern California, where he worked as an actor, model, photographer, and surf instructor. Following his arrest in this case, Carico moved back to Florida, where he works for a construction company. Carico recently sold his California home and therefore has over $300,000 in a savings account.

To Carico's credit, he voluntarily debriefed with the FBI and identified the friends who met him in Washington, D.C., for the rally. Further, he has no criminal history. Yet despite a positive upbringing, family support, post-high school education, and multiple promising job opportunities, Carico still decided to invade the Capitol on January 6, 2021.

However, Carico minimized his conduct during his interviews. And in his pre-sentence interview, Carico claimed that he had not used marijuana since he was about 25 years old (about eight years ago). Only after he was confronted with contrary statements he made to the FBI did Carico request for the pre-sentence report to be amended to reflect that he had used marijuana shortly before his arrest. Carico's lack of candor to the pre-sentence interviewer calls into question whether other statements he made were truthful or simply self-interested. His history and characteristics demonstrate that incarceration is an appropriate punishment.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[4] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption

---

[4] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C); *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. For the violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. *See also United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37 ("As other judges on this court have recognized, democracy requires the cooperation of the citizenry. Protesting in the Capitol, in a manner that delays the certification of the election, throws our entire system of government into disarray, and it undermines the stability of our society. Future would-be rioters must be deterred.") (statement of Judge Nichols at sentencing).

The gravity of these offenses demands deterrence. This was not a protest. It is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Carico's actions and words on and since January 6, 2021, demonstrate that a sentence of incarceration is necessary to deter him from committing a crime of this nature in the future. Carico enjoyed his time as a rioter: he stayed inside the Capitol for nearly an hour, called for a "second wave," and, after being forced out of the Capitol, stayed on the Capitol Grounds to hurl epithets at the nation's elected leaders. Carico said repeatedly that he didn't think he had done anything wrong. And, despite having witnessed violence firsthand, Carico repeated the lie that January 6 was a peaceful protest. Moreover, Carico has expressed remorse only in preparation for sentencing, and he failed to be completely truthful about his marijuana use during his pre-sentence interview. At bottom, a sentence of incarceration is necessary for Carico to understand the gravity of his actions on January 6 and to ensure that he does not reoffend.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on law enforcement officers, to conspiracy to corruptly interfere with Congress.[5] Each offender must be sentenced based on their individual circumstances, but with the backdrop of the January 6 riot in mind. Moreover, each offender's case will exist on a spectrum

---

[5] Attached to this sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants. *See* Exhibit A.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment. The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021 were not minor crimes. A probationary sentence should not necessarily become the default.[6] Indeed, the government invites the Court to join Judge Lamberth's admonition that "I don't want to create the impression that probation is the automatic outcome here because it's not going to be." *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19; *see also United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 ("Judge Lamberth said something to the effect . . . 'I don't want to create the impression that probation is the automatic outcome here, because it's not going to be.' And I agree with that. Judge Hogan said something similar.") (statement of Judge Friedman).

The government and the sentencing courts have already begun to make meaningful distinctions between offenders. Those who engaged in felonious conduct are generally more dangerous, and thus, treated more severely in terms of their conduct and subsequent punishment. Those who trespassed, but engaged in aggravating factors, merit serious consideration of

---

[6] Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC), *United States v. Douglas K. Wangler*, 1:21-cr-00365(DLF), and *United States v. Bruce J. Harrison*, 1:21-cr-00365(DLF). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

institutional incarceration. Those who trespassed, but engaged in less serious aggravating factors, deserve a sentence more in line with minor incarceration or home detention.

The defendant has pleaded guilty to Count Four of the Information, charging him with Parading, Demonstrating, or Picketing in the Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(6), do apply, however.

Although all of the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences—such as how a defendant entered the Capitol, how long she remained inside, the nature of any statements she made (on social media or otherwise), whether she destroyed evidence of his participation in the breach, etc.—help explain the differing recommendations and sentences. And as that discussion illustrates, avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement. *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

Moreover, assessing disparities, and whether they are unwarranted, requires a sufficient pool of comparators. In considering disparity, a judge cannot "consider all of the sentences not yet imposed." *United States v. Godines*, 433 F.3d 68, 69–71 (D.C. Cir. 2006). "The most a judge can do is consider those other sentences that do exist," and "[t]he comparable sentences will be much

smaller in the early days of any sentencing regime than in the later." *Id.*; *see generally United States v. Accardi*, 669 F.3d 340, 346 (D.C. Cir. 2012) ("Without more, two allegedly similar cases constitute too small a sample size to support a finding of an 'unwarranted disparity' in sentences."). In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6)."). Because the Sentencing Guidelines do not apply here, the sentencing court cannot readily conduct a disparity analysis against a nationwide sample of cases captured by the Sentencing Guidelines.

Even in Guidelines cases, sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343–44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against law enforcement officials, and large number of victims. Thus, even though many of the defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

While no previously sentenced case may contain the same balance of aggravating and mitigating factors present here, the Court may also consider the sentences imposed on Tam Pham and Jeremy Sorvisto for reference.

In *United States v. Tam Pham*, 21-cr-109 (TJK), the Court imposed a sentence of 45 days of incarceration, a $1,000 fine, and $500 of restitution. Like Carico, Pham entered the Capitol, including the Rotunda, and yelled his support for the riot (for example, "We're taking the house back!"). Pham was inside the Capitol for about 20 minutes—less than half as long as Carico—but, unlike Carico, he entered the office suite of a member of Congress. In a pre-arrest interview, Pham falsely told the FBI that he had not entered the Capitol, before being confronted with deleted photos he had taken inside the Capitol. To Carico's credit, he admitted that he entered the Capitol (albeit in a post-arrest interview). But both Pham and Carico minimized their conduct, including by claiming that they entered only to take photos rather than to join the mob. Carico, unlike Pham, witnessed and recorded violence. Pham's conduct, however, was made more egregious by the fact that he was a police officer at the time. Considering the mix of factors, the sentence requested for Carico would avoid unwarranted sentencing disparities.

In *United States v. Jeremy Sorvisto*, 21-cr-320 (ABJ), the Court imposed a sentence of 30 days of incarceration and $500 of restitution. Sorvisto entered the Capitol through the Senate Wing Doors about five minutes after Carico. But Sorvisto was ushered out of the Capitol after about 25 minutes—less than half the time Carico spent inside. Unlike Carico, Sorvisto did not stay on the Capitol Grounds to continue rioting after leaving the Capitol. Both Sorvisto and Carico sent text messages on January 6, 2021, bragging about their participation in the breach of the Capitol. Following his participation in the riot, Sorvisto destroyed evidence (a distinctive jacket he had worn in the Capitol) and told his associate to delete photos from his phone. Similarly, Carico destroyed evidence when he deleted photos and videos from his camera that he had taken inside the Capitol. In sum, the sentence that Sorvisto received after engaging in relatively similar conduct demonstrates that the requested sentence avoids unwarranted sentencing disparities.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095.

## V. The Court's Lawful Authority to Impose a Split Sentence

The sentence requested by the government—30 days of incarceration followed by 36 months of probation—is a lawful one. A sentencing court may impose a "split sentence"—"a period of incarceration followed by period of probation," *Foster v. Wainwright*, 820 F. Supp. 2d 36, 37 n.2 (D.D.C. 2011) (citation omitted)—for a defendant convicted of a federal petty offense, such as the crime at issue in this case. *See* 18 U.S.C. § 3561(a)(3). In addition, for a defendant convicted of any federal offense, a sentencing court may impose incarceration for a brief interval as a condition of probation under 18 U.S.C. § 3563(b)(10).

### a. A sentence imposed for a petty offense may include both incarceration and probation.

#### i. Relevant Background

In 1984, Congress enacted the Sentencing Reform Act, which in substantial part remains the sentencing regime that exists today. *See* Pub. L. No. 98–473, §§211-212, 98 Stat 1837 (1984),

*codified at* 18 U.S.C. § 3551 *et seq.*; *see Mistretta v. United States*, 488 U.S. 361, 365-66 (1989) (noting that the Sentencing Reform Act of 1984 wrought "sweeping changes" to federal criminal sentencing). That legislation falls in Chapter 227 of Title 18, which covers "Sentences." Chapter 227, in turn, consists of subchapter A ("General Provisions"), subchapter B ("Probation"), subchapter C ("Fines"), and subchapter D ("Imprisonment). Two provisions—one from subchapter A and one from subchapter B—are relevant to the question of whether a sentencing court may impose a term of continuous incarceration that exceeds two weeks[7] followed by a term of probation, such as the sentence requested by the United States here.

First, in subchapter A, 18 U.S.C. § 3551 sets out "[a]uthorized sentences." Section 3551(a) makes clear that a "defendant who has been found guilty of" any federal offense "shall be sentenced in accordance with the provisions of" Chapter 227 "[e]xcept as otherwise specifically provided." 18 U.S.C. § 3551(a). Section 3551(b) provides that a federal defendant shall be sentenced to "(1) a term of probation as authorized by subchapter B; (2) a fine as authorized by subchapter C; or (3) a term of imprisonment as authorized by subchapter D." 18 U.S.C. § 3551(b).[8] As a general matter, therefore, "a judge must sentence a federal offender to either a fine, a term of probation, or a term of imprisonment." *United States v. Kopp*, 922 F.3d 337, 340 (7th Cir. 2019).

Second, 18 U.S.C. § 3561, the first provision in subchapter B, addresses a "[s]entence of probation." As initially enacted, Section 3561 provided that a federal defendant may be sentenced to a term of probation "unless . . . (1) the offense is a Class A or Class B felony and the defendant is an individual; (2) the offense is an offense for which probation has been expressly precluded; or

---

[7] A period of incarceration that does not exceed two weeks followed by a term of probation is also permissible under 18 U.S.C. § 3653(b)(10). *See* Part V(b) *infra*.

[8] Section 3551(b) further provides that a sentencing judge may impose a fine "in addition to any other sentence." 18 U.S.C. § 3551(b).

(3) the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense." Pub. L. No. 98-473, at § 212; *see United States v. Anderson*, 787 F. Supp. 537, 539 (D. Md. 1992) (noting that the Sentencing Reform Act did not permit "a period of 'straight' imprisonment . . . at the same time as a sentence of probation").

Congress, however, subsequently amended Section 3561(a)(3). In 1991, Congress considered adding the following sentence to the end of Section 3561(a)(3): "However, this paragraph does not preclude the imposition of a sentence to a term of probation for a petty offense if the defendant has been sentenced to a term of imprisonment at the same time for another such offense." H.R. Rep. 102-405, at 167 (1991). Instead, three years later Congress revised Section 3561(a)(3) by appending the phrase "that is not a petty offense" to the end of the then-existing language. *See* H.R. Rep. No. 103-711, at 887 (1994) (Conference Report). In its current form, therefore, Section 3561(a)(3) provides that a defendant "may be sentenced to a term of probation unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense." 18 U.S.C. § 3561(a)(3).

ii. <u>Analysis</u>

Before Congress passed the Sentencing Reform Act of 1984, sentencing courts could impose a split sentence on a federal defendant in certain cases. *See United States v. Cohen*, 617 F.2d 56, 59 (4th Cir. 1980) (noting that a sentencing statute enacted in 1958 had as its "primary purpose . . . to enable a judge to impose a short sentence, not exceeding sixth months, followed by probation on a one count indictment"); *see also United States v. Entrekin*, 675 F.2d 759, 760-61 (5th Cir. 1982) (affirming a split sentence of six months' incarceration followed by three years of probation). In passing the Sentencing Reform Act, Congress sought generally to abolish the practice of splitting a sentence between imprisonment and probation because "the same result"

could be accomplished through a "more direct and logically consistent route," namely the use of supervised release as set out in 18 U.S.C. §§ 3581 and 3583. S. Rep. No. 225, 1983 WL 25404, at *89; *accord* United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") § 5B1.1, Background. But Congress's 1994 amendment to Section 3561(a)(3) reinstated a sentencing court's authority to impose a split sentence for a petty offense.

Under 18 U.S.C. § 3561, a defendant "may be sentenced to a term of probation unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense." 18 U.S.C. § 3561(a)(3). Thus, for any federal offense *other than* a petty offense, Section 3561(a)(3) prohibits "imposition of both probation and straight imprisonment," consistent with the general rule in Section 3551(b). *United States v. Forbes*, 172 F.3d 675, 676 (9th Cir. 1999); *see United States v. Martin*, 363 F.3d 25, 31 (1st Cir. 2004); *United States v. Harris*, 611 F. App'x 480, 481 (9th Cir. 2015); *Anderson*, 787 F. Supp. at 539.

But the statutory text of 18 U.S.C. § 3561(a)(3) goes further by permitting a court to sentence a defendant to a term of probation "unless" that defendant "is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense." 18 U.S.C. § 3561(a)(3). It follows that when a defendant *is* sentenced for a petty offense, that defendant may be sentenced to a period of continuous incarceration and a term of probation. *See United States v. Posley*, 351 F. App'x 807, 809 (4th Cir. 2009) (per curiam). In *Posley*, the defendant, convicted of a petty offense, was sentenced to two years of probation with the first six months in prison. *Id.* at 808. In affirming that sentence, the Fourth Circuit concluded that Section 3561(a)(3) "[u]nquestionably" provided statutory authority to sentence the petty-offense defendant to "a term of six months of continuous imprisonment plus probation." *Id.* at 809; *see* Cyclopedia of Federal Procedure, § 50:203, *Capacity of court to impose probationary sentence on defendant in*

*conjunction with other sentence that imposes term of imprisonment* (3d ed. 2021) ("[W]here the defendant is being sentenced for a petty offense, a trial court may properly sentence such individual to a term of continuous imprisonment for a period of time, as well as a sentence of probation.") (citing *Posley*); *see also* Wright and Miller, *Federal Practice and Procedure*, § 547, at n.13 (4th ed. 2021) ("A defendant may be sentenced to probation unless he . . . is sentenced at the same time to imprisonment for an offense *that is not petty*.") (emphasis added).

Nor does the phrase "that is not a petty offense" in Section 3561(a)(3) modify only "different offense." Section 3561(a)(3) does not state "the same *offense* or a different offense that is not a petty offense," which would imply that the final modifier—*i.e.*, "that is not a petty offense"—applies only to "different offense." The phrase "that is not a petty offense" is a postpositive modifier best read to apply to the entire, integrated phrase "the same or a different offense." *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 148 (2012). Had Congress sought to apply the phrase "not a petty offense" solely to "different offense," the "typical way in which syntax would suggest no carryover modification" would be some language that "cut[s] off the modifying phrase so its backward reach is limited." *Id.* at 148-49. And while the indefinite article "a" might play that role in other contexts (*e.g.*, "either a pastry or cake with icing" vs. "either a pastry or a cake with icing"), the indefinite article in Section 3561(a)(3) merely reflects the fact that the definite article before "same" could not naturally apply to the undefined "different offense."

Permitting a combined sentence of continuous incarceration and probation for petty offenses is sensible because sentencing courts cannot impose supervised release on petty-offense defendants. *See* 18 U.S.C. § 3583(b)(3); *United States v. Jourdain*, 26 F.3d 127, 1994 WL 209914, at *1 (8th Cir. 1994) (unpublished) (plain error to impose a term of supervised release for a petty

offense). When Congress in 1994 amended the language in Section 3561(a), it again provided sentencing courts with "latitude," *see* S. Rep. 98-225, 1983 WL 25404, at *89, to ensure some degree of supervision—through probation—following incarceration.

Section 3551(b)'s general rule that a sentencing court may impose either imprisonment or probation (but not both) does not preclude a sentencing court from imposing a split sentence under Section 3561(a)(3) for a petty offense for three reasons. First, Section 3551(a) notes that the sentencing provisions described there apply "[e]xcept as otherwise specifically provided." Section 3561(a)(3) does "provide[]" "otherwise": it recognizes a carveout for petty offenses.

Second, the more specific permission for split sentences in petty offense cases in Section 3561(a)(3) prevails over the general prohibition on split sentences in Section 3551(b). *See Morton v. Mancari*, 417 U.S. 535, 550-51 (1974) ("Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one."). When Congress enacted the general prohibition on split sentences in Section 3551(b), it had not yet enacted the more specific carveout for split sentences in petty offense cases in Section 3561(a)(3). *See supra*, at 26 (recounting statutory history). That carveout does not "void" the general prohibition on split sentences in Section 3551(b); rather, Section 3551(b)'s general prohibition's "application to cases covered by the specific provision [in Section 3651(a)(3)] is suspended" as to petty offense cases. Scalia & Garner, *supra*, at 184. In other words, Section 3551(b)'s prohibition against split sentences "govern[s] all other cases" apart from a case involving a petty offense. *Ibid.*

Third, to the extent Section 3551(b)'s general prohibition against split sentences conflicts with Section 3561(a)(3)'s permission for split sentences in petty offense cases, the latter, later-enacted provision controls. *See Posadas v. Nat'l Bank of N.Y.*, 296 U.S. 497, 503 (1936) ("Where provisions in the two acts are in irreconcilable conflict, the later act to the extent of the conflict

constitutes an implied repeal of the earlier one."); Scalia & Garner, *supra*, at 327-329. Where a conflict exists "between a general provision and a specific one, whichever was enacted later might be thought to prevail." *Id.* at 185. "The "specific provision"—here Section 3561(a)(3)—"does not negate the general one entirely, but only in its application to the situation that the specific provision covers." *Ibid.* Section 3551(b)'s general prohibition does not operate against the more specific, later-enacted carveout for split sentences in Section 3561(a)(3).

An interpretation of Sections 3551(b) and 3561(a) that a sentencing court "must choose between probation and imprisonment when imposing a sentence for a petty offense," *United States v. Spencer*, No. 21-cr-147-CKK, Doc. 70 at 5 (Jan. 19, 2022), fails to accord the phrase "that is not a petty offense" in Section 3561(a)(3) any meaning. When Congress in 1994 amended Section 3561(a)(3) to include that phrase, it specifically permitted a sentencing court in a petty offense case to deviate from the otherwise applicable general prohibition on combining continuous incarceration and probation in a single sentence. Ignoring that amended language would improperly fail to "give effect to every clause and word" of Section 3561(a)(3). *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385 (2013).

Congress's unenacted language from 1991, *see supra*, at 26, does not suggest that a split sentence is available only where a defendant is sentenced at the same time for two different petty offenses or for two offenses, at least one of which is a petty offense. For one thing, the Supreme Court has regularly rejected arguments based on unenacted legislation given the difficulty of determining whether a prior bill prompted objections because it went too far or not far enough. *See Mead Corp. v. Tilley*, 490 U.S. 714, 723 (1989) ("We do not attach decisive significance to the unexplained disappearance of one word from an unenacted bill because 'mute intermediate legislative maneuvers' are not reliable indicators of congressional intent.") (citation omitted).

Moreover, under that view, every offense other than a petty offense could include some period of incarceration and some period of supervision (whether that supervision is supervised release or probation). Yet so long as a defendant was convicted of two petty offenses, that defendant could be sentenced to incarceration and supervision (in the form of probation). No sensible penal policy supports that interpretation.

It follows that a sentencing court may impose a combined sentence of incarceration and probation where, as here, the defendant is convicted of a petty offense. Here, the defendant pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building, which is a "petty offense" that carries a maximum penalty that does not exceed six months in prison and a $5,000 fine. *See* 18 U.S.C. § 19; *see United States v. Soderna*, 82 F.3d 1370, 1381 n.2 (7th Cir. 1996) (Kanne, J., concurring) (citations omitted) (noting that a petty offender may face a sentence of up to five years in probation).

> ***b.  A sentence of probation may include incarceration as a condition of probation, though logistical and practical reasons may militate against such a sentence during an ongoing pandemic.***

> i.  Relevant Background

In 18 U.S.C. § 3563, Congress set out "[c]onditions of probation." 18 U.S.C. § 3563. Among the discretionary conditions of probation a sentencing court may impose is a requirement that a defendant

> remain in the custody of the Bureau of Prisons during nights, weekends or other intervals of time, totaling no more than the lesser of one year or the term of imprisonment authorized for the offense, during the first year of the term of probation or supervised release.

18 U.S.C. § 3563(b)(10). Congress enacted this provision to give sentencing courts "flexibility" to impose incarceration as a condition of probation in one of two ways. S. Rep. No. 225, 1983 WL 25404, at *98. First, a court can direct that a defendant be confined in "split intervals" over

weekends or at night. *Id.* Second, a sentencing court can impose "a brief period of confinement" such as "for a week or two." *Id.*[9]

ii. Analysis

A sentencing court may impose one or more intervals of imprisonment up to a year (or, as here, up to the six-month statutory maximum) as a condition of probation, so long as the imprisonment occurs during "nights, weekends or other intervals of time." 18 U.S.C. § 3653(b)(10). Although the statute does not define an "interval of time," limited case law suggests that it should amount to a "brief period" of no more than a "week or two" at a time. *United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history described above and reversing magistrate's sentence that included 30-day period of confinement as a condition of probation); *accord United States v. Baca*, No. 11-1, 2011 WL 1045104, at *2 (C.D. Cal. Mar. 18, 2011) (concluding that two 45-day periods of continuous incarceration as a condition of probation was inconsistent with Section 3563(b)(10)); *see also Anderson*, 787 F. Supp. at 538 (continuous 60-day incarceration not appropriate as a condition of probation); *Forbes*, 172 F.3d at 676 ("[S]ix months is not the intermittent incarceration that this statute permits."). Accordingly, a sentence of up to two weeks' imprisonment served in one continuous term followed by a period of probation is permissible under Section 3563(b)(10).[10]

---

[9] Section 3563(b)(10)'s legislative history notes that imprisonment as a term of probation was "not intended to carry forward the split sentence provided in Section 3561, by which the judge imposes a sentence of a few months in prison followed by probation." S. Rep. No. 225, 1983 WL 25404, at *98.

[10] Section 3563(b)(10)'s use of the plural to refer to "nights, weekends, or intervals of time" does not imply that a defendant must serve multiple stints in prison. Just as "words importing the singular include and apply to several persons, parties, or things," "words importing the plural include the singular." 1 U.S.C. § 1; *see* Scalia & Garner, *supra*, at 129-31.

A sentencing court may also impose "intermittent" confinement as a condition of probation to be served in multiple intervals during a defendant's first year on probation. 18 U.S.C. § 3563(b)(10); *see Anderson*, 787 F. Supp. at 539. Notwithstanding a sentencing court's legal authority to impose intermittent confinement in this manner, the government has refrained from requesting such a sentence in Capitol breach cases given the potential practical and logistical concerns involved when an individual repeatedly enters and leaves a detention facility during an ongoing global pandemic. Those concerns would diminish if conditions improve or if a given facility is able to accommodate multiple entries and exits without unnecessary risk of exposure. In this case, the government does not request that imprisonment be imposed through "intermittent" confinement as a condition of probation.

## VI. Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Michael Aaron Carico to thirty days in jail, three years of probation, 60 hours of community service, and $500 restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


By:     */s/ Jacob R. Steiner*
        JACOB R. STEINER
        CA Bar No. 325239
        Trial Attorney, Detailee
        555 4th Street, N.W.
        Washington, D.C. 20530
        202-924-5829
        Jacob.Steiner@usdoj.gov